UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| American Center for Law and Justice–Northeast, Inc.,<br>          *Plaintiff*,<br><br>          *v.*<br><br>American Center for Law and Justice, Inc., and Jay Alan Sekulow,<br>          *Defendants*. | Civil No. 3:12cv730 (JBA)<br><br><br><br>June 22, 2012 |

RULING ON MOTION FOR PRELIMINARY INJUNCTION AND ON MOTION TO STAY AND COMPEL ARBITRATION

Plaintiff American Center for Law and Justice Northeast ("ACLJ Northeast") moves [Doc. # 11] for a preliminary injunction to prevent Defendants American Center for Law and Justice ("ACLJ National") and its General Counsel Jay Alan Sekulow from withholding funds from Plaintiff and to continue paying Plaintiff in accordance with their Agreement until July 31, 2012. Plaintiff also asks the Court to order Defendants to release any funds to Plaintiff that are being held in escrow, and to continue paying funds to Plaintiff after July 31, 2012 until "after a full trial is had." Defendant moves [Doc. # 19] to stay the proceedings and to compel arbitration, citing Section 8 of the Agreement between ACLJ Northeast and ACLJ National. For the reasons discussed below, Plaintiff's motion will be denied, and Defendants' motion will be granted.

I.      Factual Background

ACLJ Northeast is a not–for–profit 501(c)(3) organization with its principal place of business in Connecticut. Mr. Vincent McCarthy is the President of ACLJ Northeast, which has a staff of two lawyers, Mr. McCarthy and his wife, Anne Louise Lohr. Its offices are located in Mr. McCarthy and Ms. Lohr's home.

In 1997, Plaintiff entered into a contract with Defendant ACLJ National in which Defendant "provid[ed] a sustaining grant to ACLJ Northeast to help cover the costs and expenses of ACLJ, Northeast in developing and establishing its organization." (Agreement at 1.) Defendant ACLJ National was to provide funds to Plaintiff in order to provide free legal representation to individuals and organizations whose First Amendment rights or "family rights" had been violated. (Pl.'s Mem. Supp. at 2.) The initial grant period lasted for five years, in accordance with Section 5 of the Agreement, and was thereafter renewed for an additional five years. From 2007 to 2011, Defendant renewed Plaintiff's funding on an annual basis, as provided for in Section 5. In January 2012, Defendant notified Plaintiff that it would be terminating the relationship between the parties and discontinuing the funding provided by ACLJ National as of July 31, 2012. On May 16, Plaintiff commenced this lawsuit, and on May 22, 2012, Defendant ceased all remaining payments to ACLJ Northeast, in spite of its previous communications that payments would continue until July 31, 2012, representing that the funds were being held in escrow with its attorney.

II.     Discussion

        A.      Motion for a Preliminary Injunction

 "[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990). To succeed on such a motion, a plaintiff must show a likelihood of success on the merits, and that (1) she is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate for that injury; (3) the balance of hardships tips in her favor; and (4) the public interest would not be dis–served by the issuance of a preliminary injunction. *Rex Medical v. Angiotech Pharmaceuticals, Inc.*, 754

F. Supp. 2d 616, 629 (S.D.N.Y. 2010) (citing *Salinger v. Colting*, 607 F.3d 68, 74–75 (2d Cir. 2010)).[1]

Plaintiff argues that it will suffer irreparable harm absent an emergency injunction, and that there is no adequate remedy at law for the harms it has and will continue to suffer. (Pl.'s Mem. Supp. at 3.) In opposition, Defendant argues that Plaintiff's motion for a preliminary injunction must be denied because Plaintiff cannot demonstrate that it will suffer irreparable harm in the absence of an injunction, which should terminate the analysis. In the alternative, Defendant argues that Plaintiff cannot demonstrate a likelihood of success on the merits on their breach of contract claim (Count One), tortious interference with business relations claim (Count Two), or their declaratory judgment (Count Three) claim seeking declaration that it can operate under its corporate name.

1.      *Irreparable Injury*

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.*, 437 F. Appx. 57, 58 (2d Cir. 2011). Where money damages are adequate to compensate the moving party for its harm, injunctive relief is inappropriate. *See, e.g.*, *Savage v. Gorski*,

---

[1] The court in *Salinger v. Colting*, 607 F.2d 68 (2d Cir. 2010) stated that its holding applied to "preliminary injunctions in the context of copyright cases" but also observed that it saw "no reason that *eBay* [*v.MercExchange, L.L.C.*, 547 U.S. 388 (2006)] would not apply with equal force to an injunction in *any* type of case." *Id.* at 607 F.3d at 78 n. 7 (emphasis in original). The "historical" standard requires that Plaintiff show "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiffs favor; and (3) that the public's interest weighs in favor of granting an injunction," *Metro. Taxicab Bd. of Trade v. City of N.Y.*, 615 F.3d 152, 156 (2d Cir.2010). However, under either standard, the Court concludes that Plaintiff fails to meet its burden.

850 F.2d 64, 67 (2d Cir.1988) ("Since reinstatement and money damages could make appellees whole for any loss suffered during this period, their injury is plainly reparable and appellees have not demonstrated the type of harm entitling them to injunctive relief.") Here, what Plaintiff seeks is clearly calculable—ACLJ Northeast seeks payment of the remainder of the funds for the contract term ending on July 31, 2012, and seeks continuation of its contract for another term, as well as damages for breach of contract.

ACLJ Northeast has not demonstrated that it will suffer irreparable injury if an injunction is not issued, nor that money damages at the conclusion of the case will not be sufficient. The record shows that the grant funds that Plaintiff received from ACLJ National were used almost entirely to fund the salaries of its two lawyer–employees, Mr. McCarthy and his wife Ms. Lohr. In the loss of employment context, "an insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (probationary employee's discharge did not give rise to irreparable injury).

Plaintiff seeks to distance itself from such rationale, likening its circumstances to "distributorship" cases in which the Second Circuit has found that a business's loss of a key product could constitute irreparable injury for the purposes of a preliminary injunction. *See, e.g., Roso–Lino Beverage Distrib., Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125–26 (2d Cir. 1984) ("The loss of Roso–Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm. What plaintiff stands to lose cannot be fully compensated by subsequent monetary

4

damages."); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (right to continue twenty–year old dealership "is not measurable entirely in monetary terms"). However, the Second Circuit has also found, in other distributorship/service provision cases, that the loss of business alone is insufficient to prove irreparable harm, particularly where a plaintiff has the ability to find new customers. *See Freeplay Music v. Verance*, 80 F. Appx. 137, 138–39 (2d Cir. 2003) ("Freeplay has only suggested that it will lose profits and concedes that it can contract with another company for similar, if not identical services. Its allegation that it will lose its entire business is not borne out by the record.").

While Plaintiff is technically correct that this is not an employment termination case, the principle behind *Samson* remains pertinent to the Court's analysis: Plaintiff is a not–for–profit corporation whose sole service is provided by the two attorneys and their "insufficiency of savings or difficulties in immediately obtaining other employment," *Sampson*, 415 U.S. at 92 n.68,  while they continue to provide their particularized free legal services, is not enough to rise to the level of irreparable harm. *See, e.g.*, *Ahmad v. Long Island Univ.*, 18 F. Supp. 2d 245, 249 (E.D.N.Y. 1998) ("Dr. Ahmad is not precluded from seeking other employment, and continuing his research and teaching elsewhere, once his termination comes to pass. . . . Significantly, he is a professional who holds a doctorate . . . . [w]ith reasonable certainty, he will continue to practice his learned profession. While the Court does not dispute the plaintiff's suggestion that his loss of employment will occasion some loss of reputation and interruption in his research and work, this does not amount to "irreparable harm."). Here, as in *Ahmad*, Plaintiff has not offered evidence that stopping the money stream which primarily pays Plaintiff's only two employees shows the kind of harm

that is irreparable, nor the circumstances that could constitute the "extraordinary case" contemplated in *Sampson*.[2]

Further, Plaintiff has not shown that its attorneys will be unable to continue providing its "product," i.e., free law services to certain clients without on–going funding from ACLJ National, nor that Plaintiff's product is substantially more than these attorneys' legal services. ACLJ National stated to Mr. McCarthy in a January email from James Murphy, ACLJ National Vice President of Administration, "this does not preclude you from taking on new clients or cases in your private practice that come directly to you." (*See* Jan. 19, 2012 Email from James Murphy to Vincent McCarthy, Pl.'s Ex. 4 to Prelim. Inj. Hrg.) There has been no testimony about any client that ACLJ Northeast was forced to turn away because of this grant money interruption. While Mr. McCarthy testified that most of his clients do not seek monetary damages and thus a contingent fee arrangement would be meaningless, he offered no reason why clients should not be responsible for litigation costs, nor why a statutory attorney fee award as a "prevailing party" would not be available, particularly since the primary focus for Plaintiff is claims of First Amendment violations. In fact, Plaintiff has also not offered evidence that it even has any cases right now that require ongoing work, as Mr. McCarthy testified that he currently has only one case, which awaits ruling on argued dispositive motions. ACLJ Northeast's office will remain intact, as it is located at the home of its two employees, and no evidence is offered that ACLJ Northeast

---

[2] The Supreme Court in *Sampson* also noted that "[w]e recognize that cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found. Such extraordinary cases are hard to define in advance of their occurrence." *Id.*

will not remain incorporated as a non–profit entity. That Mr. McCarthy and ACLJ Northeast may have to seek new grants for their work from other sources, or may need to make different fee or cost arrangements to provide compensation for their specialized legal services does not constitute irreparable harm, nor does the cessation of $305,000 guaranteed annual income stream to Plaintiff's attorneys. Deferred or discounted payment of legal fees is a common law office business model and provision of some pro bono service is a professional obligation of all attorneys. *See* Model Rules of Prof. Conduct, Rule 6.1 ("Every lawyer has a professional responsibility to provide legal services to those unable to pay.").

     2.    *Goodwill*

Plaintiff claims that the loss of goodwill also distinguishes this case, as it provides evidence of irreparable harm entitling Plaintiff to a preliminary injunction. Goodwill is defined as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase." Black's Law Dictionary 763 (9th ed. 2009). Under Virginia law,[3] the loss of goodwill is recognized as potential irreparable harm. *See, e.g.*, *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir.1994) ("However, when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").

Plaintiff proffered no credible evidence of its claim that its "reputation, patronage, and other intangible assets" will be irreparably harmed by "the anticipated breach by

---

[3] The Agreement contains a choice of law provision which provides: "This Agreement shall be construed and enforced in accordance with the laws of the Commonwealth of Virginia, without regard to its conflict of laws provisions." (Agreement ¶ 10.)

Defendant ACLJ National . . . because Plaintiff ACLJ Northeast will lose all of the 'goodwill' that it has developed and created as an organization since its formation." (Am. Comp. [Doc. # 27] ¶ 55.) Other than Mr. McCarthy's speculations, the only testimony related to goodwill was from Peter Wolfgang, a former client, friend, and fan of Vincent McCarthy's, who testified that if Mr. McCarthy continued to provide legal services for free, he would continue utilizing those services. This does not support Plaintiff's claim of imminent loss of goodwill, and the Court concludes that no potential loss of goodwill has been shown to support a finding of irreparable harm.

### B.    Defendant's Motion to Stay and Compel Arbitration

Though Defendant agreed at the preliminary injunction hearing that the Court should rule on the motion for preliminary injunction, it also moves to stay and compel a merits arbitration, citing Section 8 of the Agreement.

Section 8 provides: "Any controversy or claim arising out of or relating to this Agreement between ACLJ National and ACLJ, Northeast shall be submitted by arbitration before and in accordance with the rules of the Christian Conciliation Service with an independent licensed or mutually agreed to arbitrator present during the arbitration process." (Agreement ¶ 8A.) Part B of Section 8 provides, "In the event that arbitration fails, either party has the right to seek relief in any court of competent jurisdiction." (*Id.* ¶ 8.B.) Thus, while the Agreement clearly requires an arbitration, it only requires a non–binding arbitration, and in accordance with the rules of the Christian Conciliation Service.

The Rules of Procedure for the Institute of Christian Conciliation state as the purpose of Christian Conciliation:

> The purpose of Christian conciliation is to glorify God by helping people to resolve disputes in a conciliatory rather than an adversarial manner. In addition to facilitating the resolution of substantive issues, Christian conciliation seeks to reconcile those who have been alienated by conflict and to help them learn how to change their attitudes and behavior to avoid similar conflicts in the future.

(Christian Conciliation Services Rules of Procedure ¶ A(1).) The Rules defining "arbitration" as potentially binding, i.e., "the submission of a dispute to a single arbitrator or a panel of arbitrators for a legally binding decision that may become and have the same effect as a judgment of a civil court" (Rules of Procedure, Ex. 2 to Pl.'s Opp'n ¶ A(3)(H) at 2), conflict with the Agreement's provision for judicial remedy "[i]n the event that arbitration fails." On the other hand, and perhaps closer to the parties' purposes, this Service offers 'mediation,' "utiliz[ing] one or more neutral intermediaries who assist the parties in arriving at their own voluntary and mutually satisfactory resolution. Mediators may provide the parties with an advisory opinion, but that opinion shall not be legally binding." (*Id.* ¶ A(3)(G) at 2.)

For the purposes of Defendant's motion to compel arbitration, however, it is necessary to determine whether "arbitration" within the meaning of the Federal Arbitration Act ("the FAA") was in fact contemplated by the parties. The FAA evinces a strong commitment to the validity of arbitration agreements, and provides in pertinent part:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, . . . *shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

As a general matter, the Second Circuit instructs courts that "[t]he federal policy favoring arbitration requires us to construe arbitration clauses as broadly as possible." *S.A. Mineracao Da Trindade–Samitri v. Utah Intern., Inc.*, 745 F.2d 190, 194 (2d Cir. 1984). While the Second Circuit has not explicitly considered whether non–binding arbitration of the type apparently contemplated in the Agreement is enforceable under the FAA, several district courts in the Circuit have held that "[i]f the parties have agreed to submit a dispute for a decision by a third party, they have agreed to arbitration. The arbitrator's decision need not be binding in the same sense that a judicial decision needs to be to satisfy the constitutional requirement of a justiciable case or controversy." *AMF Inc. v. Brunswick Corp.*, 621 F.Supp. 456, 460 (E.D.N.Y. 1985) (applying the FAA to require a manufacturer to comply with its agreement with a competitor to obtain a non–binding advisory opinion); *see also Allied Sanitation, Inc. v. Waste Mgmt. Holdings, Inc.*, 97 F. Supp. 2d 320, 327 (E.D.N.Y. 2000) ("The concept of arbitration plausibly embraces all contractual dispute resolution mechanisms, consistent with Congress's design to foster alternative means to resolving litigation."); *CB Richard Ellis, Inc. v. American Env'tal Waste Mgmt.*, 98-CV-4183, 1998 WL 903495, at *2 (E.D.N.Y. Dec. 4, 1998) (finding mediation to fall within FAA's definition of arbitration).

Plaintiff points to *Harrison v. Nissan Motor Corp.*, 111 F.3d 343, 350 (3rd Cir. 1997), which framed the inquiry as "whether the arbitration at issue . . . might realistically settle the dispute." 111 F.3d at 350. In *Harrison*, a case in which the purchaser of an automobile sued the automobile manufacturer for failure to comply with its warranty, the Third Circuit concluded that because of the particularities of Lemon Law mechanisms, "it cannot be said, . . . that claimants under all circumstances undertake to settle their disputes when they

10

submit them to Lemon law arbitration." *Id.* The Third Circuit determined that the ADR

contemplated in the contract that case was not enforceable under the FAA, defining

'arbitration' as follows:

> [T]he essence of arbitration, we think, is that, when the parties agree
> to submit their disputes to it, they have agreed to arbitrate these
> disputes through to completion, i.e. to an award made by a
> third–party arbitrator. Arbitration does not occur until the process
> is completed and the arbitrator makes a decision. Hence, if one party
> seeks an order compelling arbitration and it is granted, the parties
> must then arbitrate their dispute to an arbitrators' decision, and
> cannot seek recourse to the courts before that time.

*Id.* Plaintiff contends that the arbitration clause in Section 8 does not require that the parties

reach a resolution or settlement prior to resorting to litigation,[4] and thus arbitration is not

likely to settle this dispute, and so it should not be compelled.

The Court disagrees with Plaintiff's reasoning, particularly where here, unlike in

*Harrison*, a consumer protection case, the parties are two organizations that share a common

mission and have worked together to advance their shared view of constitutional law since

1997. ACLJ Northeast and ACLJ National expressly intended that any disputes "arising out

of or relating to this Agreement between ACLJ National and ACLJ, Northeast shall be

submitted by arbitration before and in accordance with the rules of the Christian

Conciliation Service." (Agreement ¶ 8A.) Guided "by a need to protect the intent of the

---

[4] Plaintiff also asserts that Christian Conciliation Service does not exist, however, that
appears to be incorrect: a search for "Christian Conciliation Services," directs you to
http://www.peacemaker.net/site/c.nuIWL7MOJtE/b.5394441/k.BD56/Home.htm,   the
website for The Institution for Christian Conciliation. "Christian Conciliation Services"
appears to be in reference to the "rules" of Christian Conciliation, and that the Agreement
specifies that the parties are to agree upon an Arbitrator/mediator who will follow these
rules.

parties," *S.A. Mineracao*, 745 F.2d at 194, it is evident that the parties specifically included Section 8 in their Agreement because they contemplated a private adjudication to guide resolution of the merits of their dispute. Assuming the good faith of the parties, a neutral third party may well help to resolve this dispute in a conciliatory, rather than adversarial, manner.

III.    Conclusion

For the reasons discussed above, Plaintiff's motion for a preliminary injunction [Doc. # 11] is DENIED, and Defendant's motion [Doc. # 19] to stay and compel arbitration is GRANTED. The case is STAYED and will be administratively closed, and may be restored to the active docket upon either party's motion within 45 days of the arbitrator's decision.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of June, 2012.